# IN THE COURT OF APPEALS OF IOWA

No. 16-1240
Filed May 17, 2017

IN RE THE MARRIAGE OF CHRISTOPHER LAWRENCE SLAYMAN
AND CASSANDRA LYNN SLAYMAN

Upon the Petition of
CHRISTOPHER LAWRENCE SLAYMAN,
        Petitioner-Appellant,

And Concerning
CASSANDRA LYNN SLAYMAN, n/k/a CASSANDRA LYNN ORSI,
        Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Pottawattamie County, Greg W.

Steensland, Judge.


        Chris Slayman appeals from the order modifying the child custody

provisions of the decree dissolving his marriage to Cassandra Slayman.

**AFFIRMED.**


        Mark J. Rater of Rater Law Office, Council Bluffs, for appellant.

        Stephen C. Ebke of Ebke Law Office, Council Bluffs, for appellee.


        Considered by Potterfield, P.J., and Doyle and Tabor, JJ.

**DOYLE, Judge.**

Chris Slayman appeals from the order modifying the child custody provisions of the decree dissolving his marriage to Cassandra Slayman, now known as Cassandra Orsi. He argues Cassandra has failed to prove there has been a substantial change in circumstances since entry of the last modification order to warrant modifying the custody provisions of the decree to grant Cassandra physical care of the children. In the alternative, Chris argues the district court erred in calculating the amount of his child support, and he requests additional visitation with the children.

### I. Background Facts and Proceedings.

Chris and Cassandra are the parents of three children. In their January 2010 dissolution decree, the district court granted them joint legal custody and joint physical care of the children after finding

> that the parties communicate and indicated that they could get along with a joint physical care arrangement. They both live in Pottawattamie County, they attend school in Lewis Central School District and should continue to do so. Both parents are good parents, according to the only independent witnesses in this trial. The court finds that joint physical care is in the long term best interest of the children.

Unfortunately, things did not go as well as the district court anticipated. Less than a year after entry of the decree, Chris petitioned to modify the custody provisions to place the children in his physical care after Cassandra's boyfriend[1] harmed the children. The district court granted this modification in March 2012.

---

[1] Cassandra has since ended that relationship and married another man, with whom she has a child.

In October 2014, Cassandra petitioned to modify the decree based on a domestic violence incident in Chris's home and the alleged diminishment of Chris's mental health. She requested sole legal and physical custody of the children. The district court denied her petition in June 2015, finding "that both parties have had issues in the past that would have a negative effect on their claim for custody of the minor children" but noting that they had "conducted themselves more appropriately in recent times and seem to be making an attempt to more effectively communicate with each other in a positive way." The court also "stressed to the parties that their effective and positive communication with each other concerning their minor children was important and required for the best interests of the children."

Almost immediately after the court denied Cassandra's modification action, Chris informed Cassandra he was moving to Carroll to live closer to his girlfriend. This directly contradicted Chris's testimony during the June 2015 modification hearing that he would be remaining in the Carter Lake-Council Bluffs area. Within a month, Chris had moved, leading Cassandra to initiate the present modification action. In May 2016, the court modified the decree to place the children in Cassandra's physical care. The court granted Chis visitation on alternating weekends with three additional weeks of visitation in the summer and ordered Chris to pay Cassandra $758.21 per month in child support. Chris filed a motion to reconsider, which the court denied.[2] He now appeals.[3]

---

[2] Chris's motion to reconsider alleged several of the district court's factual findings in the modification order were inaccurate. The court reviewed its order "in light of" Chris's motion and found no reason to change or modify it. On appeal, Chris argues the court "failed to make findings of fact upon filing of [his rule 1.904 motion]." Because our

**II. Scope and Standard of Review.**

We review orders modifying dissolution decrees de novo. *See In re Marriage of McKenzie*, 709 N.W.2d 528, 531 (Iowa 2006). In doing so, we give weight to the district court's fact-findings, especially those concerning witness credibility, though we are not bound by them. *See id.*; *In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984) ("There is good reason for us to pay very close attention to the trial court's assessment of the credibility of witnesses. A trial court deciding dissolution cases 'is greatly helped in making a wise decision about the parties by listening to them and watching them in person.'" (citations omitted)). "We recognize that the district court 'has reasonable discretion in determining whether modification is warranted and that discretion will not be disturbed on appeal unless there is a failure to do equity.'" *See id.* (quoting *In re Marriage of Walters*, 575 N.W.2d 739, 741 (Iowa 1998)). We afford the district court "considerable latitude" in its determination "and will disturb the ruling only

review is de novo, the court's fact findings are not binding on appeal. *See In re Marriage of Rhinehart*, 704 N.W.2d 677, 680 (Iowa 2005). Rather than consider each of the inaccuracies alleged by Chris, we determine the relevant facts anew. *See Wilker v. Wilker*, 630 N.W.2d 590, 594 (Iowa 2001) (noting that "we are able to consult the record in its entirety and formulate our own opinion").

[3] The parties' appendix violates Iowa Rule of Appellate Procedure 6.905 in several respects. The transcript pages referenced in the table of contents do not include the name of each witness whose testimony is included and the appendix page at which each witness's testimony begins. Iowa R. App. P. 6.905(4)(b). The exhibits referenced in the table of contents do not include a concise description of the exhibit. Iowa R. App. P. 6.905 (4)(c). The portion of transcript included in the appendix is not preceded by a copy of the reporter's cover sheet. Iowa R. App. P. 6.905(7)(a). The name of each witness whose testimony is included in the appendix is not inserted at the top of each appendix page where the witness's testimony appears. Iowa R. App. P. 6.905(7)(c). The omission of transcript pages is not indicated by a set of three asterisks. Iowa R. App. P. 6.905(7)(e). While we may appear to be just nitpicking, we are not. As we have repeatedly observed: Rule compliance lightens the court's burden and promotes judicial efficiency because compliance begets uniformity, and uniformity eases the court's navigation through the thousands of briefs and appendices it reviews each year.

when there has been a failure to do equity." *In re Marriage of Okland*, 699 N.W.2d 260, 263 (Iowa 2005).

### III. Modification of Physical Care.

Chris first argues the district court erred in modifying the decree to grant Cassandra physical care of their children. He claims Cassandra failed to prove both a substantial change in circumstances warrants modification and the ability to provide superior care.

### A. Substantial Change in Circumstances.

Before modifying the custody provisions of a dissolution decree, the court must find the parties' circumstances have substantially changed in a way the parties had not contemplated at the time of the decree's entry. *See In re Marriage of Walton*, 577 N.W.2d 869, 870 (Iowa Ct. App. 1998). The change must be more or less permanent and relate to the welfare of the child. *See id.*

Chris first claims his move was within the parties' contemplation at the time of the prior modification action. He noted that at the June 2015 hearing, he testified that he and the children were living with his mother and that he desired to move out of her home. He also claims that Cassandra was aware at the time of the hearing of the possibility of a move.

At the May 2016 hearing on the present modification action, Cassandra testified that she knew Chris had a girlfriend at the time of the prior modification, but that when Chris was asked if he had intention of moving, he stated "their plans were to stay here in Council Bluffs."[4] Cassandra acknowledged she was

---

[4] By agreement of the parties, the district court took judicial notice of the prior modification proceeding. However, it appears the court reviewed a rough copy of the

aware that Chris wanted to move out of his mother's home and that his girlfriend had been looking for a job in the Council Bluffs school system. When asked whether she entertained the possibility that Chris would move to his girlfriend's town if she did not find a job in Council Bluffs, Cassandra testified, "That never came up as an issue as they had only been dating for a few months. I never came to the conclusion that he would uproot the kids after a five or six-month relationship." Counsel then persisted, "But you knew it was possible?" and Cassandra replied, "I suppose with Chris's background. Yes."

The evidence shows that during the prior modification action, the parties attempted mediation in December 2014. At that mediation session, Chris asked the mediator what would happen if he were to move, and the mediator told Chris that he would lose custody of the children. Chris claimed it was a hypothetical question that he asked because he was considering going back to school and that he did not recall the mediator's answer. The mediator then asked Chris if he was dating someone. Although Chris had been dating his current girlfriend since October of 2014, he denied that he was dating anyone. At the May 2016 hearing, Chris claimed he answered this way because he and his girlfriend were not "officially" dating until sometime in December 2014, apparently after the mediation.

In its order granting modification, the court found it "disturbing" that Chris failed to mention he was even considering a move to Carroll during the June

_____

hearing to save the parties from paying the cost involved with obtaining an official transcript. There is no transcript of the June 2015 hearing in the record on appeal. Therefore, in determining whether the move was within the parties' contemplation at the time of the prior modification action, our review is limited to the parties' recollection and the district court's fact findings regarding the June 2015 hearing.

2015 hearing and then proceeded to move to Carroll a short time after. Despite Chris's attempt to minimize the evidence, the court was "convinced" Chris discussed the possibility of moving with the mediator, was told that a move would not be acceptable, and "then proceeded to deceive this court" about the matter at the June 2015 hearing.

Substantial evidence supports the court's finding that Chris did not inform Cassandra or the court of the possibility of moving from Council Bluffs prior to resolution of the second modification action. Therefore, the move was not within the court's or Cassandra's contemplation at the time the court entered the June 2015 order.

Chris also argues the move was not a substantial change in circumstance. He cites Iowa Code section 598.21D (2015), which states that the court may consider a relocation of one-hundred-and-fifty miles or more from the children's residence at the time that custody was awarded a substantial change in circumstance. Chris argues his move to Carroll does not qualify as a substantial change in circumstances because the move is only a distance of approximately ninety-eight miles.

Although section 598.21D provides that a move of more than 150 miles may qualify as a substantial change in circumstance, nothing in the law prohibits the court from finding a substantial change in circumstance has arisen from a move of less than this distance. A move of less than that distance standing alone cannot qualify as a substantial change in circumstance. *See In re Marriage of Witzenburg*, 489 N.W.2d 34, 36 (Iowa 1992) (finding a move of more than sixty miles alone would not constitute a material and substantial change in

circumstances); *In re Marriage of Howe*, 471 N.W.2d 902, 903 (Iowa Ct. App. 1991) ("The moving of the children a mere distance of forty-two miles, standing alone, is not the type of change of circumstances contemplated either by statute or case law."). Rather, in determining whether a move of less than 150 miles is a substantial change in circumstances, "the trial court must consider all of the surrounding circumstances," which includes "the reason for removal, location, distance, comparative advantages and disadvantages of the new environment, impact on the children, and impact on the joint custodial and access rights of the other parent." *In re Marriage of Frederici*, 338 N.W.2d 156, 161 (Iowa 1983).

We agree Chris's move to Carroll is a substantial change in circumstances that warrants modification of the custody provisions of the dissolution decree. Chris chose to move to Carroll not out of necessity, but out desire to live with his girlfriend—who, by Chris's own account, he had only been "officially" dating for approximately six months. The move did not benefit the children, who do not attend school in Carroll but are "transported one-half hour away in order to catch a bus at the school where [Chris's girlfriend] is a 4th grade teacher so they can be bused to a school in that school district." Most troubling is Chris's decision to move without notifying Cassandra that such a move was even under consideration. "A decision by a joint custodial parent with physical care of minor children to change residences is 'the kind of decision the other joint custodian has a right to be consulted about.'" *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015) (quoting *Frederici*, 338 N.W.2d at 159). Moreover, the record indicates that Chris deceived Cassandra and the district court about the possibility of a move during the June 2015 hearing, informing Cassandra of his

decision to move immediately after the modification action concluded and accomplishing the move within one month. *Cf. id.* at 33 (finding that although the parent with shared care of the children "could have been more forthcoming about the development of her plan to move with the children," the other parent "anticipated the move might occur and clearly communicated his opposition to the prospect more than a year before it happened").

The evidence shows a substantial change of circumstances not contemplated at the time the district court denied Cassandra's prior modification action.

### B. Superior Care.

Having determined a substantial change in circumstances exists, we next consider whether the change in circumstances warrants modifying the shared care provisions of the dissolution decree. Because changing physical care is one of the most significant modifications that can be undertaken, *see In re Marriage of Thielges*, 623 N.W.2d 232, 236 (Iowa Ct. App. 2000), the parent seeking modification "has a heavy burden and must show the ability to offer superior care," *In re Marriage of Malloy*, 687 N.W.2d 110, 113 (Iowa Ct. App. 2004). *See also In re Marriage of Spears*, 529 N.W.2d 299, 301 (Iowa Ct. App. 1994) (stating "once custody of a child has been fixed, it should be disturbed only for the most cogent reasons").

The controlling consideration in determining child custody is the children's best interests. *See In re Marriage of Fennelly*, 737 N.W.2d 97, 101 (Iowa 2007). This consideration includes, but is not limited to, "the opportunity for *maximum continuous physical and emotional contact possible with both parents*, unless

direct physical or significant emotional harm to the child may result from this contact." Iowa Code § 598.1(1) (emphasis added). Our objective "is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). The Iowa legislature and our supreme court have provided a nonexclusive list of factors the court is to consider in determining the children's best interests. *See In re Marriage of Hansen*, 733 N.W.2d 683, 696 (Iowa 2007) (citing Iowa Code § 598.41(3) and *In re Marriage of Winter*, 223 N.W.2d 165, 166-67 (Iowa 1974)).

We agree Cassandra has shown a superior ability to care for the children. Cassandra ended her relationship with the man who harmed the children, so the concerns that attended the 2012 custody modification no longer exist. Cassandra has remarried and lives with her husband, a youth pastor, and the children's two half-siblings. She is a stay-at-home mother who works part-time as a self-employed person, allowing her greater flexibility in caring for the children. She lives in the same area the children have called home their entire lives. In contrast, we have concerns about Chris's decision to move without consulting Cassandra or even informing her—or the court—that such a move was being considered. His actions show a willingness to put his own needs ahead of the children's best interests. Accordingly, we affirm the order modifying the decree to grant Cassandra physical care.

**IV. Child Support Award.**

Because we affirm the order modifying custody to place the children in Cassandra's care, we address Chris's request to "recompute[] child support in accordance with the guidelines and the travel requirements in this order."

The district court computed Chris's child support obligation pursuant to the child support guidelines after determining his earnings to be $28,000 per year. The court determined this amount based on fulltime employment at $13.50 per hour.[5] The court based Chris's hourly rate of earnings on his testimony at the May 2016 hearing. Chris claims his hourly rate of earnings is $11.65 per hour but that he can earn up to $13.50 per hour if he works nights and weekends.

The record supports the finding Chris earns $28,000 per year. At the April 2016 hearing, Chris testified he earned $13.50 per hour and his bi-weekly earnings were approximately $900 to $1000. He explained that he earns a base hourly rate, but that his hourly rate increases if he works nights and weekends. Chris testified that he works weekends when the children are not in his care and that he works nights so he can be home with the children after their school day ends. Chris also provided his paystub for the most recent pay period—March 16, 2016 through March 31, 2016—as evidence of his earnings. The paystub shows his year to date wages for the first three months of 2016 to be $7,165.90; if Chris were to earn at this rate over the course of the year, his annual income would be $28,663.60. We affirm the child support award.

---

[5] Basing Chris's income on a forty-hour work week for a period of fifty-two weeks at the amount of $13.50 per hour yields in a gross annual income of $28,080.

**V. Visitation Award.**

Finally, Chris asks for additional visitation because the court granted him less visitation time with the children than Cassandra had prior to the modification. Chris requests additional time in the summer, over school breaks, and "maybe even time during the week."

The legislature has directed the courts to award "liberal visitation rights where appropriate" in order to "assure the child the opportunity for the maximum continuing physical and emotional contact with both parents." Iowa Code § 598.41(1)(a). In determining what visitation is appropriate, our concern, once again, is the children's best interests. *See In re Marriage of Stepp*, 485 N.W.2d 846, 849 (Iowa Ct. App. 1992). Consequently, the court must fashion a visitation schedule that serves the best interests of the children. *In re Marriage of Gensley*, 777 N.W.2d 705, 718 (Iowa Ct. App. 2009). Again, we give deference to the district court's opportunity to view the witnesses and determine the facts, *see Nicolou v. Clements*, 516 N.W.2d 905, 906 (Iowa Ct. App. 1994), and, recognizing that court's discretion, we "will not disturb its decision unless the record fairly shows it has failed to do equity." *In re Marriage of Salmon*, 519 N.W.2d 94, 95 (Iowa Ct. App. 1994).

The district court modified the decree to provide Chris visitation with the children every other weekend from 6:00 p.m. Friday until 6:00 p.m. Sunday. It also awarded Chris three one-week visits with the children during the summer. The court outlined a schedule for visitation during holidays. Finally, the modified decree states, "The parties may agree to change the schedule and are

encouraged to work together to adjust the visitation schedule around work schedules, children's activities, and extended family holiday plans."

Prior to the 2016 custody modification, Cassandra received visitation every other week from 4:00 p.m. Friday until 4:00 p.m. Sunday. She also received two one-week visits with the children during the summer and weekly visitation from 4:00 p.m. Wednesday until 4:00 p.m. Thursday. After Chris moved to Carroll, the parties agreed to modify the visitation schedule to limit Cassandra's weekly Wednesday visits during the school year to 5:00 p.m. until 8:00 p.m. but add an additional visit from 4:00 p.m. Saturday until 4:00 p.m. Sunday on the weekends that she did not already have visitation.

In the eyes of litigating parents, no court-imposed visitation schedule is ever perfect. And although strict schedules do not lend themselves well to the vagaries of life, conflict between the parties necessitates a court-ordered visitation plan. Upon our de novo review, we determine the visitation schedule fashioned by the district court is in the children's best interests and we decline to tinker with the judgment call made by the district court.

**VI. Appellate Attorney Fees Award.**

Cassandra asks for an award of her appellate attorney fees. Whether to make such an award is within our discretion. *Spiker v. Spiker*, 708 N.W.2d 347, 360 (Iowa 2006). It depends on three factors: (1) the needs of the party making the request, (2) the ability of the other party to pay, and (3) whether the party making the request was obligated to defend the trial court's decision on appeal.

*Id.*  Considering these factors, we find it appropriate to award Cassandra $500 in appellate attorney fees.

**AFFIRMED.**